UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

Lisa M. Borrello,

                              Plaintiff,


                    v.


                                                    **Hon. Hugh B. Scott**

                                                       00CV177A

New York State Department of Correctional
Services; Ronald Moscicki, Superintendent of Lakeview        **Report**
Shock Incarceration Correctional Facility; Michael            **&**
Marshall, Deputy Superintendent of Lakeview Shock       **Recommendation**
Incarceration Correctional Facility; Richard Moffit, Food
Service Administrator at Lakeview Shock Incarceration
Correctional Facility; Brian McKenna, Head Cook and
Supervisor at the Lakeview Shock Incarceration
Correctional Facility; Amy Farnham, Head Cook at the
Lakeview Shock Incarceration Correctional Facility; and
Dawn Raynor, Head Cook and Supervisor at the
Lakeview Shock Incarceration Correctional Facility,

                              Defendants.

_____


        Before the Court are the following motions: plaintiff's motion to compel (Docket No.

153, 156, and 159); defendant Moffit's cross-motion to compel discovery (Docket No. 164);

defendant Moffit's motion for summary judgement (Docket No. 188); defendant Raynor's

motion for summary judgement (Docket No. 189); defendant Farnham's motion for summary

judgement (Docket No. 190); defendant McKenna's motion for summary judgement (Docket No.

1

196 and 253[corrected]); defendant New York State Department of Correctional Services motion for summary judgement (Docket No. 197); Marshall's motion for summary judgement (Docket No. 204); and defendant Moscicki's motion for summary judgement (Docket No. 206).

## Background

The plaintiff, Lisa M. Borrello ("Borrello"), brings this action alleging that the defendants violated her civil rights under 42 U.S.C. §2000e ("Title VII") and New York State law.  Named as defendants in this matter are: New York State Department of Correctional Services ("DOCS"); Ronald Moscicki ("Moscicki"), Superintendent of Lakeview Shock Incarceration Correctional Facility ("Lakeview") ; Michael Marshall ("Marshall"), Deputy Superintendent of Lakeview; Richard Moffit ("Moffitt"), Food Service Administrator at Lakeview; Brian McKenna ("McKenna"), Head Cook and Supervisor at Lakeview; Amy Farnham ("Farnham"), Head Cook at Lakeview; and Dawn Raynor ("Raynor"), Head Cook and Supervisor at Lakeview.

Borrello was hired by DOCS to work as a cook at Lakeview on April 15, 1994.  On April 18, 1995, she was "bumped" from her position at Lakeview by a more senior employee and transferred to the Collins Correctional Facility.   At some point, Borrello requested that she be transferred back to Lakeview. In August of 1997, she applied for a Head Cook's position at Lakeview.  On October 9, 1997, Borrello was transferred back to Lakeview, but not in the Head Cook's position (Docket No. 109 at ¶¶ 14-18).

According to Borrello, shortly after transferring back to Lakeview, McKenna, her supervisor, advised her that they had already picked Jim Pietro for the Head Cook's position and

2

that if she wanted to be a Head Cook, she should transfer to another facility. (Docket No. 109 at ¶ 20).  She asserts that McKenna stated that Borrello was "just another female thinking she would get a Head Cook's position over a guy;" that "if we don't want you to be in the Head Cook spot, there are always ways of throwing a wrench in the game, we've done it in the past, we can do it in the future;" and that another female cook "isn't going to make it." (Docket No. 109 at ¶¶ 22-24).  The plaintiff asserts that no female was promoted to a Head Cook position at Lakeview from 1997  until July 27, 2002 when Borrello was promoted to the position of Head Cook pursuant to an Order obtained in arbitration. (Docket No. 109 at ¶ 25).  Borrello asserts that McKenna harassed and retaliated against her in the following ways:

- McKenna allegedly insulted her in front of co-workers and inmates; unfairly reprimanded her about the smallest errors, enforced work rules against only her, shouted and swore at her, threatened her, challenged her to fights, intentionally attempted to make her cry, and subjected her to unwarranted criticism, discipline and ridicule. (Docket No. 109 at ¶¶ 27)

- McKenna intentionally caused problems for the plaintiff by arranging to have insufficient quantities of food prepared for plaintiff's shift so that the plaintiff would run out of food during meal runs. He would then criticize and blame the plaintiff for these results and give her negative job performance evaluations. (Docket No. 109 at ¶¶ 28)

- McKenna intentionally destroyed Borrello's paperwork; and on February 3, 1998, McKenna became loud and hostile in reprimanding the plaintiff and challenged her to a fight for complaining about his abusive treatment. (Docket No. 109 at ¶¶ 29-32).

- McKenna ordered and intimidated inmates into writing letters against the plaintiff which were kept in her personnel file. (Docket No. 109 at ¶ 40).

- McKenna humiliated Borrello by placing her name on the list of inmate job assignments and then telling her in front of co-workers and inmates that she should "go work with the inmates because you're as stupid as they are." (Docket No. 109 at ¶ 41).

The plaintiff asserts that McKenna, along with Moffit, Farnham and Raynor, gave preferential treatment to male cooks (Pietro and Tony Porpiglia) in that they did not scrutinize and write up male cooks for small mistakes although they did so to her; they provided Pietro with additional assistance and instruction which was not given to her so that it would appear that Pietro made fewer mistakes than Borrello; they would notify Pietro of errors by placing post-it notes on his paperwork which allowed him to correct his mistakes, but did not use this procedure for the plaintiff; when she asked questions, these defendants would treat the interaction as a "counseling" session, but not do so when male cooks asked questions. (Docket No. 109 at ¶¶ 33-39).

Borrello claims that she reported this harassing behavior to the defendants but no action was taken. (Docket No. 109 at ¶ 43, 46).   Instead, she claims that McKenna took her into his office and told her that she was a "whining, sniffling little bitch." (Docket No. 109 at ¶ 44). Borrello alleges that he met with Marshall to complain about McKenna's treatment, but that he advised her that because McKenna was her supervisor, "he can do whatever he wants." (Docket No. 109 at ¶ 51).   Borrello asserts that Marshall had assured her the meeting was confidential, but that when she saw Moffit and McKenna shortly afterward, they were already aware of her meeting with Marshall.  (Docket No. 109 at ¶ 52).   She claims that she heard Marshall tell Moffit and McKenna that they "better write down everything she does; you better cover your asses." (Docket No. 109 at ¶¶ 53).

The plaintiff contacted Jerry Gonclaves, an employee at DOCS' Office of Diversity Management ("ODM") in Albany to complain about the harassment.  Gonclaves came to Lakeview to speak with Borrello on March 17, 1998. Borrello asserts that the defendants

4

harassment became noticeably worse after Gonclaves visit. (Docket No. 109 at ¶¶ 54-56). She

claims that on March 24, 1998, a job posting for a head cook's position at Collins Correctional

Facility was placed in her mailbox at Lakeview; on the posting someone had written: "Go back to

where you came from Cook B or OOPS" as well as a reference to "snitching." (Docket No. 109

at ¶ 57-58).  Borrello claims that a commendation letter sent to the mess hall cooks was not

placed in her mailbox, although the other cooks received the letter. (Docket No. 109 at ¶¶  59-

60).   Borrello also claims that on March 25, 1998, McKenna falsely accused her of leaving

$500.00 worth of food out in the back hallway after her shift and gave her a formal written

counseling in order to hurt her chances of promotion. (Docket No. 109 at ¶ 61).

On March 30, 1998, Borrello alleges that Pietro was appointed to the Head Cook's

position even though he had less seniority than her. The plaintiff claims that Moffit justified

promoting Pietro by relying on the reports, criticisms and job performance evaluations he and the

other defendants created. (Docket No. 109 at ¶¶ 62-64). Another cook, Porpiglia grieved the

promotion given to Pietro and was successful. Borrello claims that Pietro was removed from the

Head Cook's position, but kept as a "temporary Head Cook" to place him in a preferential

position for the next permanent Head Cook position.  (Docket No. 109 at ¶ 65).   The plaintiff

also claims that Moffit intentionally misrepresented her abilities, job performance and

qualifications to administration officials in Albany. (Docket No. 109 at ¶ 66).

On May 5, 1998, the plaintiff filed a complaint with the New York State Division for

Human Rights alleging that she was discriminated against because of her sex in that she was

denied a promotion and subjected to a hostile work environment.  The complaint was cross-filed

with the Equal Employment Opportunity Commission ("EEOC").

The plaintiff claims that the harassment continued thereafter. According to Borrello, on June 2, 1998, McKenna failed to notify her of an emergency telephone call regarding an ill family member; she was denied overtime although less senior male co-worker received overtime; a request that she be allowed to obtain outside employment was denied although other employees were able to engage in outside employment; and on July 1, 1998, McKenna falsely claimed to have an asthma attack due to the plaintiff's perfume resulting in the plaintiff being instructed by Moffit to wash off the perfume. (Docket No. 109 at ¶¶ 69-74). Borrello also asserts that at an August 5, 1998 meeting, Gonclaves, along with Marshall attempted to pressure her into agreeing to drop her complaints so that they could close the investigation. She resisted. Gonclaves terminated the investigation shortly after the meeting. (Docket No. 109 at ¶¶ 75-80).

Borrello alleges that on November 16, 1998, she complained to Moscicki about McKenna's harassment. Two days later, according to Borrello, Moscicki advised her that he had concluded an investigation and found no proof of anything wrong. (Docket No. 109 at ¶¶ 81-84).

The plaintiff was given an unsatisfactory evaluation for the period from October 9, 1997 to September 14, 1998. She appealed the determination to the Statewide Performance Evaluation Appeals Board ("SPEAB"). SPEAB changed the unsatisfactory evaluation to satisfactory and indicated that it was "greatly disturbed to see how little documentation was provided to support the allegations made in your performance appraisal ... most disturbing is the apparent pattern of harassment by your supervisor." (Docket No. 109 at ¶¶ 86-87). On October 21, 1999, the plaintiff was again given an unsatisfactory evaluation by Moffit and Farnham. The plaintiff asserts that this evaluation was reviewed and approved by Marshall. The plaintiff claims that the

poor evaluations and unfair counselings are part of a pattern of retaliation because of her complaints.

Borrello claims that on November 24, 1999, McKenna "admitted" that he held her complaints to the Inspector General ("IG") and to the ODM against her. (Docket No. 109 at ¶ 95). On November 29, 1999, Borrello filed a complaint with the Chautauqua County Sheriff's Department based upon an allegedly harassing telephone call she had with McKenna on November 24, 1999. On December 13, 1999, Borrello sent a letter to Moscicki informing him about the November 24, 1999 telephone call and asking him to preserve surveillance videotape from S-Block. The plaintiff copied this letter to the IG's Office. Moffit and Marshal were also advised of the allegedly harassing November 24, 1999 call inasmuch as they were purportedly sent a memorandum about the call by "Captain P. Greis" on November 26, 1999. The plaintiff claims that Moscicki, Marshall and Moffit all failed to take proper action to investigate or protect the plaintiff in response to the harassing November 24, 1999 call from McKenna. (Docket No. 109 at ¶¶ 99 -105). Borrello alleges that McKenna threatened to physically harm her if he lost his job because she complained about the November 24, 1999 phone call. The plaintiff also claims that after a heated argument between herself and McKenna, McKenna stated, in front of Corrections Officer Joseph Press, "I don't like working with fucking women." (Docket No. 109 at ¶ 170).

McKenna resigned on July 7, 2000. The plaintiff contends that DOCS was aware that McKenna was falsifying pay records and forcing her to work alone and without proper supervision. (Docket No. 109 at ¶¶ 107-112).

The plaintiff alleges that Raynor has harassed employees who have cooperated with the ODM investigation.  Borrello claims that prior to going on sick leave, Raynor advised her replacement, Graig Rosplock ("Rosplock") that she did not like Borrello and that he should write her up because "Rich wants something on Lisa". (Docket No. 109 at ¶¶ 114-115). According to the plaintiff, Rosplock did not do as Raynor asked, but instead gave the plaintiff a sworn statement corroborating her allegations of harassment.  Borrello claims that Raynor started harassing Rosplock when she returned from sick leave and that Rosplock filed a successful grievance relating to Raynor's harassment. (Docket No. 109 at ¶¶ 116-117). Raynor also allegedly humiliated Borrello by making her go outside in "sub-freezing" weather to rummage through a garbage filled dumpster in order to find a lost potato receipt even though Raynor had already contacted the vendor to have a duplicate receipt sent. (Docket No. 109 at ¶ 137).  The plaintiff also claims that Raynor falsely accused Borrello of failing to lock the cooler door. (Docket No. 109 at ¶¶ 138-139).

Borrello also asserts that on March 17, 1998, Raynor provided a sworn statement in which she stated:

> It's a joke here, Moffit knows exactly what's going on with McKenna harassing Borrello and he just sits back and laughs because Marshall and Moscicki will do what they want and they will get their way.  I was abused mentally by M. Marshall– asking the other cooks to write To-Froms to him to let him know what I was doing wrong.

(Docket No. 109 at ¶ 168).

The plaintiff alleges that Farnham "threatened and warned" her not to go up against Marshall and Moffit; that she was "playing with fire;" and "going to get set up."  (Docket No.

109 at ¶ 118). Borrello further asserts that Farnham unfairly criticized the plaintiff's evaluations of kitchen workers; ordered her to re-write the evaluations; falsely accused plaintiff of feeding extra food to inmates; unfairly counseled the plaintiff on the procedures for completing paperwork, instructing the plaintiff to use a certain procedure and then criticize the plaintiff for utilizing that procedure. (Docket No. 109 at ¶¶ 119-124).

The plaintiff alleges that Moffit continued to unfairly evaluate her even after she had been promoted to the position of Head Cook (Docket No. 109 at ¶141); that he purportedly interfered with Borrello's request for a transfer and allegedly told Corrections Officer Daniel Streit that "she's not going anywhere, we'll take care of her here." (Docket No. 109 at ¶ 153). She claims that Moffit unfairly recommended her termination based upon evaluations he knew to be false and misleading. (Docket No. 109 at ¶¶ 161-162).

Borrello claims that Moffit and Farnham sabotaged her computer entries; that Farnham's boyfriend (Corrections Officer Roger Burroughs) attempted to obstruct a recent ODM investigation by intimidating the plaintiff and other witnesses; that the defendants have tried to discourage other Lakeview employees from assisting the plaintiff in connection with her claims; and that employees who assist the plaintiff get written up or receive poor evaluations. (Docket No. 109 at ¶¶ 126-136). The plaintiff also claims that the defendants falsely evaluated her to prevent her from obtaining incremental pay increases under the collective bargaining agreement ("CBA") (Docket No. 109 at ¶¶ 158-159). She alleges that Moffit and McKenna kept private personal files on her, but did not keep such files on other cooks who did not complain about harassment or retaliation. (Docket No. 109 at ¶¶ 163-166). Borrello claims that one day after the arbitrator ordered the plaintiff to be promoted to the Head Cook position, Marshall retaliated

9

against her by changing the shifts on July 28, 2002 in order to deny her the opportunity to have

weekends off. (Docket No. 109 at ¶ 167).

     Based upon these allegations, the plaintiff asserts the following claims:

> Count I – a Title VII claim against DOCS alleging that she was
> subjected to differential treatment based upon her gender;
>
> Count II – a Title VII claim against DOCS alleging that she was
> denied a promotion based upon her gender;
>
> Count III– a Title VII claim against DOCS alleging that she was
> subjected to a hostile work environment in violation;
>
> Count IV– a claim against McKenna under the New York State
> Human Rights Law (Executive Law § 296) alleging that he
> engaged in a pattern and practice of unlawful sex discrimination
> against her;
>
> Count V– a Title VII claim against DOCS asserting a pattern and
> practice of unlawful retaliation against the plaintiff based upon her
> complaints of unlawful sexual harassment and gender
> discrimination;
>
> Count VI– a §1983 claim against DOCS, McKenna, Marshall,
> Moffit, Moscicki, Farnham and Raynor alleging retaliation against
> the plaintiff based upon her complaints of unlawful sexual
> harassment and gender discrimination;
>
> Count VII – a §296 claim against McKenna asserting that he
> illegally retaliated against the plaintiff for asserting her
> constitutional, federal and state law rights;
>
> Count VIII– a §1983 claim against DOCS, McKenna, Marshall,
> Moffit, Moscicki, Farnham and Raynor alleging a violation of her
> equal protection rights;
> Count IX– a New York State law claim of prima facie tort against
> McKenna; and
>
> Count X – a New York State law claim of intentional infliction of
> emotional distress against McKenna.

Each of the defendants has moved for summary judgement.


**Summary Judgement**

Summary judgment is appropriate where there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law.  See Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F. 2d 186, 188 (2nd Cir. 1992) citing Bryant  v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  To prevail on its summary judgment motion, the moving party must show that "there is no genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  In applying this standard, we "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra v. General Electric Co., 252 F.3d 205, 216 (2d Cir.2001).

In discrimination cases, the inquiry into whether the plaintiff's gender caused the conduct at issue often requires an assessment of individuals' motivations and state of mind, matters that call for a "sparing" use of the summary judgment device because of juries' special advantages over judges in this area.  Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61 (2d Cir.1998); accord Gallagher v. Delaney, 139 F.3d 338, 342 (2d Cir.1998) (noting juries' possession of the "current real-life experience required in interpreting subtle sexual dynamics of the workplace based on nuances, subtle perceptions, and implicit communications").

Nonetheless, an employment discrimination plaintiff faced with a properly supported summary judgment motion must "do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). See Distasio, 157 F.3d at 61. She must come forth with evidence sufficient to allow a

reasonable jury to find in her favor. See <u>McCarthy v. New York City Technical College</u>, 202

F.3d 161, 167 (2d Cir.2000).  In this regard, the non-moving party must, "demonstrate to the

court the existence of a genuine issue of material fact." <u>Lendino v. Trans Union Credit</u>

<u>Information</u>, Co., 970 F.2d 1110, 1112 (2nd Cir. 1992), citing <u>Celotex Corp. v. Catrett</u>, 477 U.S.

317, 324 (1986).  A fact is material:

> when its resolution would "affect the outcome of the suit under the
> governing law" and a dispute about a material fact is genuine "if
> the evidence is such that a reasonable jury could return a verdict
> for the non-moving party."

<u>General Electric Company v.  New York State Department of Labor</u>, 936 F.2d 1448, 1452 (2nd

Cir. 1991), quoting <u>Anderson v.  Liberty Lobby, Inc</u>., 477 U.S. 242, 248 (1986).  "The non-

moving party must come forward with enough evidence to support a jury verdict ... and the ...

motion will not be defeated merely ... on the basis of conjecture or surmise."  <u>Trans Sport</u>, supra,

964 F.2d at 188.  Summary judgment is appropriate "[w]here the record taken as a whole could

not lead a rational trier of fact to find for the non-moving party." <u>Nippon Fire & Marine Ins. Co.,</u>

<u>Ltd. v. Skyway Freight Systems, Inc.</u>, 235 F.3d 53 (2nd Cir. 2000) quoting <u>Matsushita Elec.</u>

<u>Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).


**The Defendants' Motions**

Moffit seeks summary judgment (Docket No. 188).  He agues that there is "no credible

evidence demonstrating that the alleged incidents forming the basis for plaintiff's claim were

gender based." (Docket No. 188, Exhibit A, ¶ 6).  He states that Lakeview houses both male and

female inmates who participate in a military boot camp environment, as well as a few hundred

maximum security inmates.  Because of this mix, Moffit asserts that the mess hall operates

differently than those at other correctional facilities.  He maintains that the inmates participating

in the shock program engage in strenuous physical activities and are provided with a higher

calorie meal than inmates at ordinary facilities; that they are not permitted to speak and are given

only 10 minutes to eat.  As a result of this regimen, Moffit argues, food must be prepared and

waiting and the impacts of mistakes by food service personnel are magnified. (Docket No. 188,

Exhibit A, ¶¶ 11-20). With respect to an alleged failure to allow Borrello to work swap or double

shifts, Moffit asserts that Borrello was not "eligible" for swaps or doubles because she was on

"probationary status" after she first became a head cook. (Docket No. 188, Exhibit A at ¶ 25-27).

In her motion for summary judgment (Docket No. 189), Raynor asserts that once Borrello

was promoted to the position of head cook in July of 2001, Borrello attained the same job title

and position as Raynor, and thus, Raynor had no authority over Borrello.   Because of this,

Raynor argues that she was not capable of engaging in any of the activities alleged by Borrello.

(Docket No. 189 at ¶¶ 9-11).[1]

The primary argument asserted by Farnham in her motion for summary judgment (Docket

No. 190) is that the claims against her are moot. Farnham asserts that although Borrello alleged

two causes of action against her pursuant to §1983, the only relief Borrello seeks from Farnham

is injunctive relief enjoining Farnham from continuing any illegal practices against Borrello.

(Docket No. 190 at ¶¶  4-5).  Farnham, who was promoted to an administrative position at the

Attica Correctional Facility subsequent to the commencement of this action, contends that since

---

[1]  Raynor also asserts that Borrello's claim for a permanent injunction against her is moot. Raynor contends that because Borrello also seeks an injunction against DOCS, and DOCS is Raynor's employer,  inasmuch as any injunction granted against DOCS "would apply to" Raynor. (Docket No. 189 at ¶¶  18-19)

she no longer works at Lakeview and does not supervise Borrello, she is not subject to the injunctive relief sought. (Docket No. 190 at ¶¶ 10-11).

DOCS also moves for summary judgment with respect to the four Title VII claims (First, Second, Third and Fifth causes of action), as well as the retaliation and equal protection claims under two §1983 (the Sixth and Eighth cause of action)(Docket No. 197). [2] With respect to the §1983 claims, DOCS maintains that these claims were previously dismissed by the Court and that Borrello was expressly denied permission to reassert them. (Docket No. 197 at ¶ 12-14). With respect to the remaining claims, DOCS contends that Borrello is unable to establish a prima facie showing. (Docket No. 197 at ¶ 22).

Defendant Marshall's motion for summary judgment (Docket No. 204) similarly argues that the plaintiff has failed to establish a prima facie case. With respect to the plaintiff's claim that she was not promoted because of her gender, Marshall argues that the position Borrello sought, which was eventually given to Pietro, was first offered to Janice Ortel. (Docket No. 205 at page 3). Further, he notes that two of the four head cooks at Lakeview were female, one – Farnham— had been promoted to a position over McKenna notwithstanding that he had more seniority than Farnham.  (Id).  Marshall also argues that inasmuch as an arbitrator determined that

---

[2]   DOCS points out that the following claims by the  plaintiff have already been dismissed in this case: plaintiff's claims against the New York State Office of Audit & Control and the New York State Department of Civil Service; the plaintiff's Title VII claims as asserted against the individual defendants; the plaintiff's §1983 claims to the extent that they assert a due process violation because she was given negative work evaluations; the plaintiff's claims under §1985(3); the plaintiff's §1983, § 1985 and state law claims asserted against DOCS; the plaintiff's §1983 and § 1985 claims for damages to the extent they were asserted against the individual defendants in their official capacities except plaintiff's claims for injunctive relief); the plaintiff's claims under §24 of the New York State Corrections Law as against all defendants except McKenna. (Docket Nos. 21 and 140).

the head cook position given to Pietro needed to be posted, and Borrello was eventually given the position, she has suffered no adverse employment action.  (Docket No. 205 at page 3-4). Marshal argues that plaintiff's claims that she is improperly being given negative evaluations cannot support her claims.[3]  Moreover, to the extent that Borrello asserts that McKenna's treatment of her constituted sexual harassment, Marshall argues that on August 5, 1998  Borrello rejected an opportunity to change her shift to limit her contact with McKenna. (Docket No. 205 at page 6).

Moscicki seeks summary judgment (Docket No. 206) alleging that he did not participate in any decision to promote (or not promote) Borrello to the head cook's position in 1998. (Affidavit of Ronald Moscicki attached to Docket No. 206 [hereafter the "Moscicki Affidavit"] at ¶16). He states that when he heard that Borrello was to be promoted to the head cook's position in 2001, he met with Marshall and Moffit and told them to "make sure that Miss Borrello is given all the support, guidance and training possible."  Moscicki states that he further advised Marshall and Moffit to "make sure that Miss Borrello's job performance evaluations are fair, accurate and properly documented." (Moscicki Affidavit at ¶ 21).   Moscicki asserts that he first learned of Borrello's concerns on November 9, 1998 when he received a telephone call from Lt. Karen Ricotta, a former Lakeview employee.  According to Moscicki, Ricotta advised him that Borrello complained about "a problem" with McKenna.  Moscicki stated that he met with Borrello on November 16, 1998 to hear and discuss her concerns.  Moscicki claims that

---

[3]    In this regard, Marshall cites Valentine v. Standard & Poor's, 50 F.Supp. 2d 262, 284 (S.D.N.Y. 1999)(where evaluations do not lead to any accompanying adverse result, they do not constitute adverse actions materially altering the conditions of employment. See also, Weeks v. New York State Division of Parole, 273 F.3d. 76 (2d. Cir. 2001)(criticism of an employee which is part of training and necessary to allow employees to develop, improve, and avoid discipline, is not an adverse employment action).

Borrello's complaints were "diffuse and too old to act upon." (Moscicki Affidavit at ¶ 29). He stated that he would look into the matter and get back to Borrello. He then met with Marshall and Moffit. According to Moscicki, Moffit told him that Borrello received fair valuations and equitable treatment. Moffit advised Moscicki that Borrello refused to follow procedures and would not accept constructive criticism. On November 18, 1998, Moscicki met with Borrello, Marshall and Moffit and advised Borrello that he "was satisfied that she was being fairly evaluated and supervised." He asserts that he told Borrello that if she believed she was being treated unfairly in the future, she should contact him in a timely manner. According to Moscicki, Borrello never contacted him after that point. (Moscicki Affidavit at ¶¶ 30-32). Moscicki denies participating in, or being made aware of, any of the alleged harassing conduct by McKenna (Moscicki Affidavit at ¶¶ 33-37); or participating in or being made aware of any preferential treatment toward male employees (Moscicki Affidavit at ¶¶ 38-40). Moscicki further denies that he failed to investigate her complaints. He contends that he had no role in the ODM investigations other than to facilitate access to witnesses (Moscicki Affidavit at ¶¶ 45-48). Moscicki denies that he failed to investigate an allegedly threatening phone call to her from McKenna, stating that the call was not reported to him at the time (Moscicki Affidavit at ¶50) and that when she subsequently (on December 13, 1999) sent Moscicki a memo asking that he preserve a videotape of the phone call from McKenna to her, the videotape was preserved. Moscicki asserts that Borrello did not expressly ask Moscicki to investigate the matter and he relied upon Marshall to perform the investigation. Moscicki Affidavit at ¶¶ 50-51). He denies the plaintiff's claims that he interfered with the ODM investigations. He specifically denies the plaintiff's claim that he threatened certain staff members that their chairs would be removed and

16

they would have to stand during their shifts if they cooperated with the ODM investigation. (Moscicki Affidavit at ¶¶ 54-55).[4] Moscicki denied plaintiff's claim that he attempted to intimidate Correction Officer Streit by asking him why he was involved in the investigation. Moscicki claims that he does not recall such a conversation with Streit. (Moscicki Affidavit at ¶ 56). In response to Borrello's claim that her rights were violated when she was denied approval to engage in outside employment, Moscicki asserts that he denied her request due to Borrello's "poor record of time and attendance, and for no other reason." He also notes that this took place before he became aware of Borrello's problems with McKenna. (Moscicki Affidavit at ¶¶ 61-63). Moscicki acknowledges that Borrello sent him a memo on January 28, 2003, complaining of an insulting screen saver. He states that he forwarded the memo to Marshall and directed him to put a stop to such activity. (Moscicki Affidavit at ¶¶ 64-65). Finally, Moscicki denies Borrello's claim that he interfered with her requests to transfer to other correctional facilities, stating that "I have never communicated with any other facility about Miss Borrello". (Moscicki Affidavit at ¶¶ 72-73).

Similarly, McKenna also seeks summary judgment (Docket Nos. 196 and 253). McKenna asserts that any claims against him under the New York State Human Rights Law (New York Executive Law § 296) are impermissible inasmuch as plaintiff did not obtain permission to add such claims in her motion to amend the complaint. Further, McKenna asserts that these claims,

---

[4] Moscicki offers the following factual scenario: "This is what happened: the Deputy Superintendent for Security had reported two security breaches in the SHU and a lack of discipline among its staff. The SHU is a secure unit for inmates with disciplinary problems. A remedy was to remove the excess chairs from the SHU control room, to reduce the likelihood that officers would lounge there. There was no threat to remove all chairs. This had nothing to do with Lisa Borrello." Moscicki Affidavit at ¶ 55).

which were first asserted in the Second Amended Complaint on April 24, 2004, are barred by the applicable statute of limitations. (Memorandum of Law attached to Docket No. 196 at page 2-3). McKenna further claims that the plaintiff's §1983 claims against him must be dismissed for the same reasons asserted by DOCS with respect to the Title VII claims. (Memorandum of Law attached to Docket No. 196 at page 5). McKenna asserts that the plaintiff's state law prima facie tort claim against him must be dismissed inasmuch as Borrello has failed to allege that she has suffered special damages as required for such a claim. (Memorandum of Law attached to Docket No. 196 at page 5-6). Finally, McKenna asserts that Borrello's claim for punitive damages under her §296 claim must be dismissed inasmuch as such damages are not permissible under §296. (Memorandum of Law attached to Docket No. 196 at page 7).

The plaintiff has filed various motions to compel further discovery (Docket Nos. 153, 156, and 159), as well as a motion under Rule 56(f) seeking additional discovery to allow the plaintiff to respond to the various dispositive motions filed by the defendants. (Docket No. 211).

**Title VII Claims**

The plaintiff asserts four claims under Title VII.   Pursuant to the burden-shifting analysis outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a plaintiff first must establish a *prima facie* case of discrimination based on gender. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); McDonnell Douglas, 411 U.S. at 802. If she does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employee's dismissal. McDonnell Douglas, 411 U.S. at 802.  If the defendant proffers such a

reason, the presumption of discrimination created by the prima facie case drops out of the

analysis, and the defendant "will be entitled to summary judgment ... unless the plaintiff can

point to evidence that reasonably supports a finding of prohibited discrimination." James v. N.Y.

Racing Ass'n, 233 F.3d 149, 154 (2d Cir.2000) citing St. Mary's Honor Ctr. v. Hicks, 509 U.S.

502, 519-524 (1993); see also McDonnell Douglas, 411 U.S. at 804; Fisher v. Vassar College,

114 F.3d 1332, 1336 (2d Cir.1997) (en banc), cert. denied, 522 U.S. 1075 (1997). The  plaintiff

"must be afforded the opportunity to prove by a preponderance of the  evidence that the

legitimate reasons offered by the defendant were not its true reasons but were a pretext for

discrimination."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000).

Once a plaintiff has established a *prima facie* case, the burden of production shifts to the

employer to rebut this presumption by articulating a legitimate, nondiscriminatory reason for its

actions. Fisher, 114 F.3d at 1335-36.   The defendant's burden of production also is not a

demanding one; he or she need only offer such an explanation for the employment decision.

Fisher, 114 F.3d at 1336. Although the burden of production shifts to the defendant, the ultimate

burden of persuasion remains always with the plaintiff. St. Mary's, 509 U.S. at 507, 511.

If the defendant proffers a legitimate, nondiscriminatory reason for a challenged

employment action, "the presumption raised by the *prima facie* case is rebutted, and drops from

the case." St. Mary's, 509 U.S. at 507(internal quotations and citations omitted). "The plaintiff

then has the opportunity to demonstrate 'that the proffered reason was not the true reason for the

employment decision,' and that [the discriminatory basis] was." Fisher, 114 F.3d at 1336.  The

plaintiff need not prove that the defendant's proffered reason was false, but must demonstrate

that discrimination was at least in part a motivating factor in the defendant's actions. Bickerstaff

v. Vassar College, 196 F.3d 435, 447 (2d Cir. 1999); see also Cronin v. Aetna Life Ins. Co., 46

F.3d 196, 203 (2d Cir.1995); Sutera v. Schering Corp., 73 F.3d 13, 17 (2d Cir.1995).  However,

"the consequence of a plaintiff engaging this opportunity and demonstrating falsity is that it may

(and, in most circumstances, will) advance [the plaintiff's] greater enterprise of showing

discriminatory intent." Bickerstaff, 196 F.3d. at 447 citing Fisher, 114 F.3d at 1338-40.  See also

St. Mary's, 509 U.S. at 511-517(rejection of the defendant's proffered reasons will permit the

trier of fact to infer the ultimate fact of intentional discrimination but does not compel judgment

for the plaintiff").

In Carlton v. Mystic Transp., Inc.,  2000 WL 95036 (2nd Cir. 2000), the Second Circuit

provided further guidance as to this burden:

> At this stage, the burden shifts back to the plaintiff to offer proof
> "through presentation of his own case and through cross-
> examination" that would allow a rational factfinder to conclude
> that the proffered reason was not the true reason for the adverse
> employment action, and that [a discriminatory animus] was.  To
> meet this burden, the plaintiff may rely "on the evidence
> constituting the prima facie case, together with supportable
> inferences to be drawn from the false or erroneous character of the
> employer's proffered reason for the adverse action." ...  **Plaintiff
> need not prove that [a discriminatory animus] was the only or
> even the principal factor in the adverse employment action, but
> only that [a discriminatory animus] was at least one of the
> motivating factors in that decision.** ... Direct evidence of
> discrimination is not necessary, ...  because proof is seldom
> available with respect to an employer's mental processes. Instead,
> plaintiffs in discrimination suits often must rely on the cumulative
> weight of circumstantial evidence, since an employer who
> discriminates against its employee is unlikely to leave a
> well-marked trail, such as making a notation to that effect in the
> employee's personnel file. ***Ordinarily, plaintiff's evidence
> establishing a prima facie case and defendant's production of a
> nondiscriminatory reason for the employment action raise a
> question of fact to be resolved by the factfinder after a trial. ...
> Summary judgment is appropriate at this point only if the***

20

>*employer's nondiscriminatory reason is dispositive and forecloses*
>*any issue of material fact.*

Carlton, 2000 WL 95036  *4 (citations omitted)(emphasis added).

The defendants do not dispute that the plaintiff is a member of a protected class or that, at least for the purposes of the instant motions, she was qualified for the head cook position.  The defendants' motion for summary judgment as to the Title VII claims is based upon the argument that the plaintiff cannot establish that she has suffered an adverse employment action, or that any of the defendants' actions occurred under circumstances giving rise to an inference of discrimination. (Docket No. 210 at page 7).

        Promotion Claim

To establish a *prima facie* case of gender discrimination in connection with her promotion claim, the plaintiff must satisfy the following four elements: (1) that plaintiff falls within the protected group, (2) that plaintiff was qualified for the position, (3) that plaintiff was subject to an adverse employment decision and (4) that the adverse employment decision was made under circumstances giving rise to an inference of unlawful discrimination.  McDonnell Douglas, 411 U.S.  at 802 ; Fisher, 114 F.3d at 1335.

Borrello points to the following in support of her claim that she was denied the head cook position in 1998 based upon her gender: (1) that her supervisor, McKenna, claimed to have had a role in deciding, or at least influencing, who would get the head cook position; (2) that McKenna told her in November of 1997 that Pietro had already been chosen for the position by himself, Farnham and Moffit; (3) that McKenna stated  that if they did not want Borrello in the head

21

cook's position that they could "always throw a wrench in the game;" (4) that McKenna told

Borrello that "over [his] dead body would another female be promoted to head cook;"(5)  that

McKenna told Borrello that she was "just another female thinking she can get a head cook

position over a guy;" (6) that McKenna was passed over for a head cook position in favor of

Farnham (a female) and was hostile and insubordinate towards women; (7) that McKenna

attempted to discredit Borrello's work just prior to the decision being made on who would get the

head cook's position , inter alia, by having inmates write statements memorializing that the

plaintiff had given them pizza; and (8) that McKenna told inmates to watch Borrello and report

everything they saw to McKenna. (Docket No. 222 at page 8).

    The record includes evidence of animus beyond Borrello's own testimony.  Among the

supporting evidence provided by the plaintiff is the deposition testimony of Joseph M. Press, a

Lakeview employee.  Press testified that he observed McKenna and Borrello in an argument in

the front office, with the door closed.  He testified that he could hear McKenna yelling loudly in

a heated manner, and that Borrello was "highly emotional, upset" but was not hollering.  At some

point Press approached McKenna and asked "What was going on?"; to which McKenna replied

"I don't like working with fucking women." (Borrello's Appendix, Exhibit AA at pages 104-105,

111).  In another example, the deposition testimony of William C. Wyatt Jr., another Lakeview

employee, supports Borrello's allegation the McKenna challenged Borrello to a fight on more

than one occasion and that Borrello would exhibit "fear – she looked stricken." (Borello's

Appendix, Exhibit Z at page 112).  Lakeview employee, Laura Walsh, testified that McKenna

also threatened her; that he had told inmates: "who the hell [does she] think [she] is, I can kick

her ass all over the jail."  Walsh stated that she approached McKenna about the comments; that

22

he admitted making them and apologized to her.  (Borrello Appendix, Exhibit CC at pages 59-

61).  Still another Lakeview employee,  Susan Ticknor testified at her deposition that McKenna

yelled at her and various inmates, as well as at Borrello, but did not yell at male workers (like

Jim Pietro or John Granata) or uniformed staff because "they were bigger" than he was.

(Borrello's Appendix, Exhibit BB at page 265). The implication from the plaintiff's argument is

that a jury could infer from this that McKenna's conduct of harassing women (and others, such as

inmates, he felt superior to) was, at least in part, gender based.  The record also includes

Raynor's March 17, 1998 statement in which she asserts that in 9 years at Lakeview she

"encountered many incidents when I was treated differently as a female head cook than the

males;" that she was "written up for doing the same things the male cooks did, but they would

not be formally counseled;" that Marshall attempted to get inmates to document negative and

false complaints about me;" that she was harassed by Marshall; that she supervised McKenna

and he was insubordinate towards her; that she complained to Marshall about McKenna, but

nothing was done; that Marshall, Moffit, McKenna and Mark Peters were "the click" in the mess

hall and they covered for one another;" that McKenna "had a problem with" her and tried to

make "my life hell;" that "Moffit knows exactly what's going on with McKenna harassing

Borrello;" and that she was mentally abused by Marshall. (Borrello Appendix, Exhibit WW,

Bates Nos. 1349 -1352).

       The plaintiff further asserts that the statement of Malinda Marsh also supports her gender

discrimination claims.  In a statement dated March 17, 1998, Marsh states:

               My only knowledge of Lisa Borrello comes from a brief
       last fall (sic) when she stopped into the infirmary for hand cream
       for her chapped hands.  I didn't know her name.  Then on 2/18/98

23

at 5:50 am Lisa came into the infirmary and her face was so red like a fire engine. I asked her what's up. She stated she didn't feel very well. I knew her blood pressure must be sky high – she looked like she was about to burst. I took her into my office - shut the door and Lisa started crying – she (was) devastated. She was very upset, her supervisor was attacking her verbally and emotionally– making it impossible for her to work. She stated that her supervisor was insulting to her, demeaning to her in front of inmates and staff. She was crying – and when she told me she should have known better than coming into work today after what happened yesterday. Her supervisor had harassed her verbally the day before (2/17/98) giving her work the inmates should have been doing. Apparently her supervisor had set her up to fail the day before by not providing enough food for the meal preparation. She stated that she knew she was running out of food and she informed her supervisor and he did nothing to help her but instead demeaned her. Lisa explained that she feared she would be failing her weeks training with him on that shift if she didn't go in to work. I told her that she should report this up line to his supervisor, She stated she couldn't because she already reported other harassing incidents to the indirect supervisor and he threatened her if she took it out of the unit.

My concern about this situation was the fact that Lisa stated her great fears of working with Brian McKenna and medically her blood pressure was highly elevated –she was trembling, she was so emotionally distraught. I called up front and spoke to Sgt. Kenny Walker and stated that she could not go back into the unit. Sgt. K. Walker said he would have the Lt. (female watch commander) go back there. Medically, I couldn't allow her to go back into that situation.

At the time I was trying to fill up the accident report form when the Lt. came in and escorted Lisa up front. Rich Moffit the [food service] administrator came up and asked where's Lisa – I told him I just left her with the Lt. He said he just left my head cook. The Lt. saw Moffit coming in and she immediately walked Lisa out the back door.

To me – from what I was hearing– it was very obvious Lisa was extremely distraught. Lisa stated that McKenna told her that she could up front (sic) and that she could go to DSA Marshall – he has Marshall; they can't touch him because he doesn't need this job - it doesn't matter to him; none of it; and they know it. McKenna told her – "I hope you're happy because he was written

up by her brass friends up front." He threatened her verbally and
repeatedly said "your fucking this and that" to her. I worked 15
years at the hospital in the emergency room – surgery etc – and 3
years per diem and full time and I've seen people under duress
before and this was the first time I saw this happen here at
Lakeview SICF. I was very concerned about her driving home or
coming into work with B. McKenna the next day. I made
recommendations to Lisa – documenting the incidents, reporting
this to the administration – doing something about it.

(Borrello Appendix, Exhibit WW, Bates Nos. 1345 to 1347).

The evidence discussed above could be found (by a trier of fact) to support the plaintiff's

contention that McKenna denied her the position, or sabotaged her chances of being fairly

considered for the position, based upon her gender.

The defendants contend that "Plaintiff's allegation concerning DOCS' failure to promote

her to the 1998 Head Cook position states *only* that "Jim Pietro was appointed Head Cook even

though he had less seniority than the Plaintiff." (Docket No. 245 at page 7; Docket No. 210 at

page 9). This argument is completely specious. The defendants appear to ignore paragraphs 17-

25 and 179-184 of the Second Amended Complaint in which the plaintiff expressly links her

failure to be awarded the head cook's position to her gender. Further, no objective reading of the

Second Amended Complaint would result in the conclusion that the plaintiff did not put the

defendants on notice of her claim that she was denied the 1998 position based upon her gender.

The defendants also argue that Borrello cannot maintain a gender discrimination claim

with respect to the 1998 head cook's position because the job had first been offered to another

woman, Jan Ortel. (Docket No. 210 at page 10). The defendants have presented a memo from

Moffit to Marshall stating Ortel's qualifications for the head cook's position in one paragraph

and summarily concluded: "Ms. Ortel was offered the position on March 3, 1998 and did not

accept it." (Docket No. 194, Exhibit D).  The plaintiff maintains that there is a genuine issue of

fact as to whether Ortel was ever offered the head cook's position, and at the very least, there is

evidence that Moffit knew Ortel would never accept the position and that he discouraged her

from accepting the position. (Docket No. 222 at page 7).  In her deposition, Ortel recalled a

meeting with Moffit regarding the position as not being "pleasant." (Borrello Appendix, Exhibit

LL at page 24).  Ortel stated:

> A:    Well, I just got the real opinion that I wasn't wanted in the
>       job.  You know, I was told kind of nastily, because I was – I
>       was probably 55 then and I was told, you know, you've got
>       to do Shock training, you know, which is a four-week
>       physical training –
>
> ...
>
> Q:    All right, What else did he say that caused this interview to
>       be as now described, unpleasant?
>
> A:    Just attitude.
>
> Q:    Well, you got to help us a little bit.  When you say attitude,
>       was there a certain attitude that Mr. Moffit conveyed?
>
> A:    Yes, I felt that I was– that I – you know, shouldn't apply for
>       the job, that they really didn't want me as the head cook
>       over there.

(Borrello Appendix, Exhibit LL at page 24-25).

It is not clear whether the fact that the position was offered to another female would

necessitate a finding that the plaintiff would be precluded from maintaining a failure to promote

claim as a matter of law.  In any event, a question of fact exists as to whether Ortel was, in fact, offered the head cook's position. Ortel appears to have been under the impression that although she had discussed the position with Moffit, she had never applied for it, and "never heard anybody say the job was mine if I wanted it."  (Borrello Appendix, Exhibit LL at 48). Ortel testified: "I don't remember it being offered to me."  (Id.).  Ortel subsequently testified that she asked to interview for the position but "didn't feel at the time that [she] was really interested in it;" that she was thinking about "a possible transfer out of the place;" that she "told Rich Moffit that [she] was pretty certain that [she] would not take the head cook position at Shock before he done the interview (sic);" and that she interviewed because she "hadn't done one in a while" and that "in case [she] wanted to transfer, that they could see that I had been interviewed and that I declined the job." (Borrello Appendix, Exhibit LL at page 115).  Under these circumstances, the import and weight, if any, to be afforded to the alleged offer of the position to Ortel is, at best, a question of fact for a jury.

The defendants' argument that Borrello cannot establish a prima facie case because other women had been promoted to head cook positions previously also fails to preclude the finding that the plaintiff has established a *prima facie* case. (Docket No. 210 at page 10).  The previous promotions do not foreclose the possibility the plaintiff's sex was a factor in the determination to offer her the head cook position in 1998. Although the plaintiff has not established that McKenna was the actual decision maker as to who was to be awarded the head cook's position, a question of fact exists as to whether McKenna had any influence with the decision makers in that regard. Moreover, a question of fact exists as to whether McKenna's allegedly discriminatory conduct sabotaged the plaintiff's ability to be fairly considered for the head cook position.

27

The denial of a promotion (and the accompanying benefits, title, higher salary) constitute an adverse employment action.  The plaintiff has demonstrated circumstances giving rise to an inference of unlawful discrimination and, thus, has established a prima facie case for gender discrimination with respect to her failure to be promoted to the head cook's position in 1998. The defendants do not present an argument that Borrello was not qualified for the position or that Pietro was more qualified for the position.  Although the record reflects that Borrello's supervisor, McKenna, was not satisfied with her work performance (indeed, much of that evidence is offered as support for the plaintiff's discrimination claims), it is unclear whether the defendants are asserting McKenna's dissatisfaction with Borrello's performance as constituting a legitimate, nondiscriminatory rationale for the failure to promote Borrello in 1998.  In any event, even if it were held that the defendants have presented a legitimate, nondiscriminatory rationale for the 1998 hiring decision, the plaintiff has come forward with sufficient evidence to raise a question of fact as to whether the rationale is pretextual and that her failure to get the head cook's position in 1998 was based upon her gender.  The defendants' motion for summary judgment as to plaintiff's Title VII claim based upon her failure to be promoted to the head cook position in 1998 should be denied.

Disparate Treatment Claim

To establish a *prima facie* case of disparate treatment under Title VII, the employee must prove that: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she

was qualified to do the job. <u>Maniccia v. Brown</u>, 171 F.3d 1364, 1368 (11th Cir.2004); <u>Feingold v. New York</u>, 366 F.3d 138, 149 (2d Cir.2004); <u>Fitzgerald v. Henderson</u>, 251 F.3d 345, 356 (2d Cir.2001).

The plaintiff makes two claims in support of her disparate treatment claim: (1)  that she was denied a promotion to head cook in March of 1998 and (2) that she was subjected to a heavier workload . (Docket No. 222 at page 4).[5]   Thus, much of the evidence discussed in connection with plaintiff's failure to promote claim, also supports the plaintiff's disparate treatment claim.  In support of her claim that she was subjected to a heavier workload, the plaintiff points to her testimony that McKenna would leave Borrello to work alone while he sat in the office or left his post for extended periods of time (Docket No. 222 at page 10; Docket No. 220 at ¶¶ 27, 36, 40).  Borrello also points to the deposition testimony of Charles Farley, a Lakeview employee, who stated that: "I don't know what goes on in the back", "I don't see – McKenna working." (Borrello Appendix, Exhibit EE at page 315).  Similarly, the record includes a memo from Sgt. Hulton reflecting an occasion when McKenna was absent from the messhall

---

[5]   In addition to the failure to be promoted to the head cook position in March of 1998, the defendants had assumed  that plaintiff's gender discrimination claim was based upon the following: the denial of overtime opportunities; denial of her request for outside employment; that she was given unsatisfactory job performance evaluations both prior to and after being promoted to the head cook position in 2001; that she was subject to unwarranted "counselings"; that her request for a transfer to another facility was obstructed; and that the shifts of all cooks were manipulated to deny the plaintiff the opportunity to have weekends off. (Docket No. 210 at pages 8-9).  The plaintiff expressly states that these allegations are **not** the basis of her gender discrimination claims, but instead (with the exception of her claim that she was wrongfully given poor evaluations in 1997 and 1998) are actions supporting her retaliation claim.  Borrello asserts that the defendants' alleged conduct in wrongfully giving her poor evaluations for 1997-1998 and 1998-1999 relate to her third cause of action (hostile environment), as well as her fifth cause of action (retaliation) and sixth cause of action (§1983). (Docket No. 222 at page 4-5).

and could not be found. (Borrello Appendix, Exhibit YY at Bates No. 1358).   The plaintiff also relies upon the testimony of Eileen Theresa Bennett, another Lakeview employee, who stated:

> Okay.  What I'm trying to make clear is, when Lisa was working, they ditched her; they left her out there doing the job all by herself and took off to wherever they all wanted to go. I don't know where all these other people went; a lot of times it was in the back office. And when – I know that when Lisa wasn't around, I'd see two or three cooks on the floor; that's what I'm saying.

(Borrello Appendix, Exhibit II at page 189).

The defendant argues that the plaintiff's allegations in this regard constitute a newly asserted "claim" and that the plaintiff cannot be permitted to raise such issues at this stage of the litigation.  The Court notes that the plaintiff's allegations regarding having to carry a heavier workload do not constitute a separate claim, but are the purported supporting facts of the plaintiff's disparate treatment claim which has clearly been raised.  Although the Second Amended Complaint does not refer to the phrase "heavier workload," the pleading does alert the defendants to the fact that the plaintiff is claiming disparate treatment and that she was "forced to work alone and without proper supervision and assistance" (Second Amended Complaint at ¶ 108); that "McKenna had, in fact, been bowling while he was punched in at work and was supposed to be supervising and assisting the Plaintiff with her cooking duties" (Second Amended Complaint at ¶ 110).

The defendants also argue that being subjected to a heavier workload is "too *de minimus*" to constitute a materially adverse employment action.  The Court cannot conclude that the increased workload allegedly bourne by the plaintiff is *de minimus*, as a matter of law.  If Borrello was performing the tasks of two individuals, even if only on certain days of her weekly

30

schedule, a trier of fact could conclude that this constituted an adverse employment action.

Indeed, it has been held that subjecting an individual to a heavier workload does constitute an

adverse employment action inasmuch as the qualitative conditions of employment are impacted.

Yonehara v. American Airlines, Inc., 2004 WL 2222184, *13 (N.D.Ill.,2004)(Construing all

disputed facts in the light most favorable to the plaintiff, his heavier workload and job

requirements could be seen as an adverse employment action, as the qualitative conditions of his

employment were affected).

      The defendants argue that the job description for a cook's position is different than that

for a head cook, and that many of the cook's tasks are usually performed independent of the head

cook. (Docket No. 245 at page 5).  This argument is not persuasive.  The record reflects that

Borrello may have been treated differently than other cooks at Lakeview inasmuch as she was not

provided with assistance.  Much of this conduct is attributed to McKenna.  The record further

includes evidence from which a trier of fact could conclude that McKenna discriminated against

women.  Thus, a jury could infer that Borrello was subjected to a heavier workload by McKenna

based upon her gender.

      The plaintiff has established a prima facie case relating to her disparate treatment claim.

The defendants do not expressly assert a legitimate, non-discriminatory basis for the alleged

conduct, but rather deny that it has occurred. In any event, even if it is concluded that the

defendants have established such a legitimate, nondiscriminatory basis, the plaintiff has met her

burden of establishing a question of fact as to whether the proffered rationale is pretextual.

Based on the above, the defendants' motion for summary judgment as to the plaintiff's disparate treatment claims should be denied.

Hostile Environment Claim

To establish a *prima facie* case of sex discrimination due to a hostile work environment, a plaintiff must show [1] that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and [2] that a specific basis exists for imputing the objectionable conduct to the employer. Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir.1997) (internal citations and quotation marks omitted). The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered. Leibovitz v. N.Y. City Transit Auth., 252 F.3d 179, 188 (2d Cir.2001) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)); Brennan v. Metro. Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir.1999). This test has objective and subjective elements: the misconduct shown must be "severe or pervasive enough to create an objectively hostile or abusive work environment," and the victim must also subjectively perceive that environment to be abusive. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

Much of the evidence discussed above, including but not limited to, the gender specific statements made by McKenna, is also offered to support the plaintiff's hostile work environment claim.  In addition, Borrello asserts that McKenna had threatened her to a physical fight on several occasions (Docket No. 220 at ¶ 13; Statement of Charlie Wyatt, Borrello Appendix, Exhibit YY at page 1); McKenna allegedly humiliated Borrello by claiming to have an asthma

attack due to her perfume (Docket No. 220 at ¶ 32).  As further support for her hostile work

environment claim, Borrello asserts that McKenna directed inmates to write statements

implicating her in wrongful behavior.  For example, McKenna allegedly directed inmates to write

statements memorializing that Borrello had given them pizza. (Borrello Appendix, Exhibit J).

The defendants contend that Borrello did provide the inmates with pizza, and that there is

nothing sinister about McKenna's conduct. However, at least one of the inmates approached by

McKenna who had provided a statement felt "uneasy" about the request, and subsequently

provided another statement:

> On approx. 12-9-97, this inmate was approached by Cook
> McKenna about having pizza on 11-30-97. This inmate was also
> asked to write a statement regarding who had given this inmate the
> pizza.  This inmate felt uneasy and *as if not signing the statement
> would lead to problems*. Cook Borrello has not done anything out
> of the ordinary and this inmate felt he should not have been
> involved in what was basically a trivial matter, This inmate feels
> that Cook Borrello treats all the inmates fairly and without being
> judgmental.  She was given the O.K. by the D.I.  that was on duty
> and was not trying to violate any rules or regulations. This inmate
> feels the whole situation was an unjust and unfair one, that is why
> this inmate has written this.  This inmate has also received food on
> several occasions from other staff.

(Borrello Appendix, Exhibit J, Bates No. 1462)(emphasis added).  It appears that at least this

inmate felt coerced by McKenna into making an unwarranted statement against Borrello. This

tends to corroborate Borrello's allegations that McKenna went out of his way to seek out adverse

information against her; and further highlights the question of fact as to whether he was

motivated by discriminatory animus to do so.    The plaintiff also asserts that McKenna took

other actions to make her look incompetent, including placing food in the mess hall to make it

look as though Borrello left if it out; (Docket No. 220 at ¶ 25); gave her unsatisfactory

evaluations to discredit her performance and deny incremental pay raises (Docket No. 195, Exhibit H); that he placed a job posting in the mess hall containing a veiled threat to "go back to where you came from Cook B or OOPS" suggesting her qualification was "in snitching" (Docket No. 220 at ¶ 24); threatened her with retaliation for reporting his alleged harassment by saying that he "wasn't pulling any punches, its game on" and that he was "getting all his ducks in a row ... for the finale." (Docket No. 221 at ¶ 110).

The defendants assert that much of the evidence raised by the plaintiff is sex-neutral and that the plaintiff can point to only two isolated statements by McKenna in support of this claim. (Docket No. 210 at page 24).   Such a contention is belied by the record, including the evidence discussed above.  While it is true that many of the issues raised by Borrello may be considered sex-neutral on their face, it is well settled that such evidence may still support a hostile environment claim if the plaintiff can demonstrate a nexus between the conduct and a discriminatory animus. Alfano v. Costello, 294 F.3d 365, 375 (2d. Cir. 2002)(There is little question that incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination--for example, where the same individual is accused of multiple acts of harassment, some overtly sexual and some not.); see also Raniola v. Bratton, 243 F.3d 610, 622-23 (2d Cir.2001).  In the instant case, the plaintiff has presented sufficient evidence (particularly the alleged statements and conduct of McKenna, as well as the statements made by Raynor and Wyatt) which, at the vary least, raises a question of fact as to whether the facially sex-neutral conduct by McKenna was motivated by a discriminatory animus.

The Court notes that the conduct discussed above took place in a period of time of approximately 2½  years from August 1997 to February 2000. Based upon the severity and

frequency of the alleged conduct by McKenna, combined with his overt gender specific statements and multiple attempts at physical intimidation by challenging Borrello to fights, provide sufficient evidence from which a trier of fact could conclude that the workplace was severely permeated with discriminatory animus sufficient to alter the terms and conditions of her employment.  The record supports a finding that the plaintiff has met both the objective and subjective elements of the standard.  The record also supports a basis for imputing the objectionable conduct to the plaintiff's employer.  Again, although most of the conduct is attributed directly to McKenna (the plaintiff's supervisor), there is significant evidence in the record from which a trier of fact could conclude that the upper management at Lakeview, specifically Moffit, Marshall and Moscicki, were aware of the conduct and that insufficient steps were taken to address the problem.  It is undisputed that Borrello complained directly to Moffit, Marshall and Moscicki and that plaintiff took the matter to the Office of Diversity Management. The record includes documentary evidence from others, such as defendant Raynor's statement as well as statements from  Lakeview employees Marsh, Wyatt and Hulton, from which a trier of fact could reasonably conclude that McKenna's alleged treatment of Borrello was known to the upper management at Lakeview.

Based on the above, the plaintiff has established a *prima facie* case of sexual harassment/hostile work environment in violation of Title VII.  The defendants motion for summary judgment as to this claim should be denied.

Retaliation Claim

The plaintiff also asserts a claim of retaliation under Title VII.  "To establish a prima facie case of retaliation, an employee must show (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." Wimmer v. Suffolk County Police Dep't, 176 F.3d 125, 134 (2d Cir.1999)(quoting Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir.1998) (internal quotation marks omitted).  The Second Circuit has held that "[t]o establish the first of these elements--participation in a protected activity-- [a plaintiff] need not prove that the conditions against which he protested actually amounted to a violation of Title VII ... [but rather] must demonstrate only that he had a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law." ' Id. (quoting Manoharan v. Columbia Univ. College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir.1988)); See also Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir.1998). The reasonableness of the plaintiff's belief that she was subject to sexual harassment must be assessed in light of the totality of the circumstances. Galdieri-Ambrosini, 136 F.3d at 292.  It is also well settled that adverse employment actions are not limited to "pecuniary emoluments" and that "negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities" may be sufficient to constitute adverse employment actions. Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223-224 (2d. Cir. 2001), citing  Preda v.Nissho Iwai Am. Corp., 128 F.3d 789, 791 (2d Cir.1997).

36

For purposes of the instant motion, the defendants do not dispute that plaintiff engaged in protected activity, or that it was aware of the fact that the plaintiff engaged in protective activity. The defendants move for summary judgment solely on the ground that the plaintiff cannot establish that she suffered adverse employment action.  (Docket No. 210 at page 33).

As noted above, the plaintiff asserts the following actions taken in retaliation of her engagement in protected activity:  the denial of overtime opportunities; denial of her request for outside employment; that she was given unsatisfactory job performance evaluations which were used to deny her pay increases[6]; that she was subject to unwarranted "counselings"; that her request for a transfer to another facility was obstructed; and that the shifts of all cooks were manipulated to deny the plaintiff the opportunity to have weekends off. (Docket No. 222 at page 4).  Several of these claims have been held to constitute adverse employment actions.  For example, the Second Circuit has held that the denial of pay, even if later reimbursed, was sufficient to constitute an adverse employment action inasmuch as the plaintiff was denied the use of her salary for a period of time. Lovejoy-Wilson, 263 F.3d at 224; Liang v. CDI Corp., 345 F.Supp. 2d 305, 310 (W.D.N.Y. 2004)(Larimer, J.)(denial of pay raises due to unsatisfactory evaluations).  The plaintiff asserts that defendants McKenna, Raynor, Farnham and Moffit used informal and formal counseling sessions as a device to improperly justify promoting Pietro over Borrello and to deny Borrello incremental pay raises. (Docket No. 222 at page 23).  A question of fact exists in this regard.  Similarly, the plaintiff asserts that Moscicki denied her request for

---

[6]     It is undisputed that Borrello subsequently appealed these denials to the Statewide Employee Performance Appeal Board, which overturned the decisions and directed that she receive pay increases. (Docket No. 222 at page 24)

outside employment in retaliation for her protected activity. Although Moscicki has come forward with a legitimate, nondiscriminatory rationale for the basis of that decision (that it was based on Borrello's alleged poor time and attendance record), in light of the totality of the record, a question of fact exists as to whether the proffered basis is pretextual.

In addition, the assignment of a disproportionately heavy workload can constitute an adverse employment action. Feingold v. New York, 366 F.3d 138, 153 (2d. Cir. 2004)(Viewing the facts in the light most favorable to Feingold, a reasonable trier-of-fact could infer that Feingold were assigned a heavier docket of cases as a result of discriminatory intent.). The evidence of these actions, both separately and considered together with the other allegations of harassment, constitute a sufficient demonstration of an adverse employment action to meet the plaintiff's burden in asserting a retaliation claim under Title VII. The plaintiff has also met her burden to present sufficient evidence to raise an inference that a causal connection existed between these actions and her protected activity. Based upon the record in this case, a jury could conclude that McKenna and the other defendants took these actions in retaliation for Borrello complaining about McKenna's harassing conduct. The other arguments raised by the defendants in their reply memorandum do nothing but highlight the many additional questions of fact in this case. (Docket No. 245 at pages 18-23).

Based on the above, the defendants' motions for summary judgment as to this claim should be denied.[7]

**Plaintiff's §1983 Claims**

Borrello asserts two §1983 claims: one based upon retaliation (Count VI) and one based upon a violation of her equal protection rights (Count VIII).  It is undisputed that Title VII claims and §1983 claims are subject to the same analysis in cases such as this. The defendants move for summary judgment with respect to the plaintiff's equal protection claim based upon the arguments and analysis presented in connection with the Title VII claims. For the most part, the defendants offer no additional or independent arguments.  (Docket No. 210 at page 34-35; Docket No. 205 at page 6).  The arguments presented in support of the motion for summary judgment as to the Title VII claims similarly fail to warrant dismissal of the §1983 claims. Thus, this relief should also be denied.

Defendant Moscicki asserts that the §1983 claims asserted against him should be dismissed based upon a lack of personal involvement.  As discussed above, however, Borrello alleges that Moscicki was aware that she was being harassed by McKenna, that she met directly with Moscicki regarding the harassment, but that he did not take actions to prevent further harassment.  Although Moscicki states that he met with Borrello only once regarding McKenna and that he delegated the matter to Marshall, questions of fact exist, based upon the record in this

---

[7]  Presuming that summary judgment would be granted with respect to the plaintiff's Title VII claims, the defendants assert that dismissal of the §1983 claims is also required on the same grounds. Further, the defendants assert that the state law claims against McKenna must also be dismissed on the same basis. (Docket No. 210 at page 34-35).  This relief should also be denied.

case, as to whether such action constituted a sufficient response to the information presented to

Moscicki.  Borrello asserts that she discussed her complaints regarding McKenna, Moffit and

Marshall with Moscicki on more than one occasion.  Indeed, Moscicki admitted that she did so

"just about every time [he] came in contact with her." (Borrello Appendix, Exhibit A, page 96).

The plaintiff argues that, notwithstanding her complaint,  Moscicki assigned Marshall to

investigate her complaints of harassment and simply took the word of Marshall and Moffit that

the plaintiff was not being harassed.  (Borrello Appendix, Exhibit A, page 332).   Borrello notes

that Moscicki took such action even though he was personally aware that McKenna was "loud

and obnoxious;" that  ODM Investigator Gonclaves advised Marshall that McKenna was a very

poor supervisor (Moscicki acknowledged that Marshall had kept Moscicki up to date on the

ODM investigation). (Borrello Appendix, Exhibit at pages 169, 342, 354, and  506-507; and

Exhibit C [Gonclaves Deposition] at page 373).    The plaintiff also points out that Bonnie Long

testified that she approached Moscicki on behalf of Borrello on at least four occasions.  (Borrello

Appendix, Exhibit F at page 137).   In addition, Borrello alleges that Moscicki refused her

request for outside employment as part of the retaliation against her for expressing her

complaints against McKenna.  Assuming the facts in the light most favorable to the plaintiff as

required, this evidence demonstrated sufficient personal involvement on the part of Moscicki to

allow plaintiff to maintain her claims against him in this case.[8]

---

[8]   Moscicki also moves to dismiss the Title VII claims to the extent that they are asserted
against Moscicki individually.  This is the law of the case.

**State Law Claims**

Borrello asserts four state law claims against defendant McKenna: (1) engaging in a pattern and practice of sexual harassment against her in violation of §296 of the New York State Human Rights Law; (2) retaliation in violation of § 296; (3) prima facie tort; and (4) intentional infliction of emotional distress.[9]

McKenna argues that Borrello claims pursuant to §296 are barred by the applicable statute of limitations.  Borrello has not responded to this argument and appears to concede that these claims were asserted beyond the limitations period.  Based upon the above, the motion for summary judgment with respect to plaintiff's claims under §296 (Counts IV and VII)  should be granted.

McKenna also seeks summary judgment with respect to the plaintiff's claim for a prima facie tort. Under New York law, the requisite elements of a cause of action for prima facie tort are (1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be lawful. (Curiano v Suozzi, 63 NY2d 113 (1984). A critical element of the cause of action is that plaintiff suffered specific and measurable loss, which requires an allegation of special damages (*see,* Curiano 63 N.Y.2d. 117; Freihofer v. Hearst Corp., 65 N.Y.2d 135, 142-143 (1985).

McKenna's motion is based upon the plaintiff's failure to allege special damages in connection with this claim.  Borrello acknowledges that special damages are a necessary element

---

[9]  McKenna's moving papers do not seek dismissal of the claim for the alleged intentional infliction of emotional distress.

of a *prima facie* tort claim and that such are not alleged in the Second Amended Complaint. (Docket No. 216 at page 3).  Further, she admits that her response to defendants' interrogatories "hitherto remained incomplete" but states that she has now supplemented her interrogatory responses to include information regarding special damages. (Docket No. 216 at page 3). Borrello asserts that this disclosure should cure the defect in failing to plead special damages in connection with the prima facie tort claim, but presents no authority in support of such a proposition.  In the alternative, the plaintiff seeks leave to further amend the complaint to add language regarding special damages.  In support of this request, almost **six years** after the filing of the original complaint in this matter, the plaintiff argues that the untimeliness should be excused  because defendants "refrained from notifying the plaintiff of the defect" until the instant motion.  Further, the plaintiff asserts that she "now is in possession of all the information that would cure the defect in the pleading."  The plaintiff does not explain how it is possible that it would take six years for her to ascertain the basis of special damages for a claim she included in her original complaint in February of 2000.

The defendants also asserts that Borrello's attempt to "cure" the pleading deficiency with the supplemental interrogatory responses is inadequate because the plaintiff has still failed to provide sufficient particularity as required to maintain a prima facie tort claim.  In this regard, the plaintiff has stated that she "estimates that she has spent thousands of dollars in co-payments for prescription medications and medical treatment directly related to her condition, as well as for over the counter medicines."  She further estimates that "she spends an average of $1000.00 per year for medications and treatment related to her psychiatric condition."  (Borrello's Supplemental Responses, Docket No. 228-2 at ¶ 13).  Such round numbers, however, are not

good enough to satisfy the requirement to specify special damages for a prima facie tort claim

under New York law. U.S. for Use and Benefit of Evergreen Pipeline Const. Co., Inc. v. Merritt

Meridian Const. Corp., 95 F.3d 153, 161 (2d. Cir. 1996), (round sums state general, not special

damages) citing Leather Development Corp. v. Dun & Bradstreet, Inc., 15 A.D.2d 761 (1st Dep't

1962) (*per curiam* )(damages pleaded in such round sums, without any attempt at itemization,

must be deemed allegations of general damages), *aff'd* 12 N.Y.2d 909 (1963).

The plaintiff has not articulated a basis warranting the grant of leave to amend the

complaint to add allegations regarding special damages in this matter at this late stage of the

litigation.  As noted above, although six years has passed, the plaintiff has still not set forth (even

in discovery) special damages with sufficient particularity to satisfy her burden under the New

York law.  McKenna's motion for summary judgment should also be granted to the extent it

seeks dismissal of the plaintiff's prima facie tort claim.


**Farnham's Mootness Defense**

Farnham argues that because she no longer works at Lakeview, Borrello's claims as

asserted against her are moot.  This argument is premised upon the assertion that the fact that the

only remaining relief Borrello seeks against Farnham is injunctive. (Docket No. 192 at page 1-2).

Farnham relies upon Prins v. Coughlin, 76 F.3d. 504 (2d. Cir. 1996), which involved an

injunctive claim by an inmate against a correctional facility. Addressing a similar mootness claim

after the inmate had transferred to a different correctional facility, the Court stated that in order

for a federal court to retain jurisdiction over a case, an actual controversy must exist "at all stages

43

of review, not merely at the time the complaint is filed." Prins, 76 F.3d. at 506 quoting Preiser v.

Newkirk, 422 U.S. 395, 402 (1975); and that a case is deemed moot where the problem sought to

be remedied has ceased, and where there is "no reasonable expectation that the wrong will be

repeated." Id. quoting United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953)).  In Prins, the

Court held that it is settled that a transfer from a prison facility moots an action for injunctive

relief against the transferring facility. Prins, 76 F.3d. at 506 (citations omitted).  Borrello  does

not dispute the relevant caselaw, but asserts that Prins does not govern in the instant case because

"more than a mere possibility" exists that Farnham could be in a position to violate plaintiff's

rights in the future.[10]

    The burden is on the party asserting the mootness argument to demonstrate that the

alleged wrongful behavior could not reasonably be expected to occur; however, the purpose of

injunctive relief is to prevent future violations and there must exist more than the mere

possibility which serves to keep the case alive.  W. T. Grant, 345 U.S. at 633.  The defendant has

asserted that in her current position at the Attica Correctional Facility she has no contact with or

supervisory role over Borrello.  Thus, Farnham asserts, there is no possibility that she could

participate in the challenged conduct alleged by the plaintiff as the basis for the injunctive relief.

    Borrello does not argue that Farnham can still violate her rights or participate in the

challenged conduct for which Borrello seeks the injunctive release from Farnham's position at

Attica.  Instead, the plaintiff asserts that more than a possibility still exists that Farnham could be

---

[10]   The plaintiff cites Adarand Constructors Inc.  v. Slater, 528 U.S. 216, 222 (2000) for the proposition that moving party bears a heavy burden to demonstrate that the "challenged conduct cannot reasonably be expected to start up again."

in a position to violate the plaintiff's rights in the future because Farnham could still seek to transfer back to Lakeview (which is closer to Farnham's home than Attica) at some point in the future.   The Court is not persuaded by this argument.  Farnham asserts that there is no position for a FSA I, her current title, at Lakeview and that for her to return to Lakeview she would have to be demoted to a head cook. (Docket No. 230 at page 3). There is a FSA II position at Lakeview, however Farnham argues that she is not qualified for that position and that, in any event, that position is now filled by Moffit. (Id).  Although it is *possible* that a position might become available at Lakeview; and it is *possible* that Farnham might be interested in the position and might apply for the position; and it is *possible* that Farnham might be awarded that position, there is nothing in the record to suggest that these things are anything more than "a mere possibility."[11]   The plaintiff does not distinguish this possibility from the possibility in Prins that the inmate in that case might, at some point, be transferred back to the correctional facility from which sprung his claim for injunctive relief.

Based on the above, Farnham's motion for summary judgment should be granted.

**Plaintiff's Cross-Motion under Rule 56(f)**

The plaintiff has moved to adjourn the motions for summary judgment on the grounds that further discovery is needed to respond to the motions. (Docket No. 211).  The Court is not persuaded, as evident from the above, that the plaintiff required further discovery to respond to

---

[11]   Although the plaintiff suggests that Farnham's deposition testimony "demonstrates some equivocation about her intentions to return to Lakeview," (Docket No. 218 at page 4), the plaintiff fails to quote any language or to provide a citation to the record with respect to such language.

45

the various motions for summary judgment. To the extent this Court recommends that portions of the motions for summary judgment be granted, the plaintiff has not identified requested outstanding discovery going to those issues.  Thus, the motion under Rule 56(f) should be denied.

The Court will deal with the parties' other discovery motions in a separate Decision & Order.

## Conclusion

Based on the above, it is recommended that the defendants' various motions for summary judgment be GRANTED IN PART AN DENIED IN PART consistent with the above.

Pursuant to 28 USC §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten(10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as WDNY Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME,  OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED**

**HEREIN.**  <u>Thomas v. Arn</u>, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); <u>F.D.I.C. v.</u>

<u>Hillcrest Associates</u>, 66 F.3d 566 (2d. Cir. 1995); <u>Wesolak v. Canadair Ltd.</u>, 838 F.2d 55 (2d Cir.

1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil

Procedure, and WDNY Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to

consider arguments, case law and/or evidentiary material which could have been, but was not,

presented to the Magistrate Judge in the first instance.  See <u>Patterson-Leitch Co. Inc. v.</u>

<u>Massachusetts Municipal Wholesale Electric Co.</u>, 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to WDNY Local Rule 72.3(a)(3), "written

objections shall specifically identify the portions of the proposed findings and recommendations

to which objection is made and the basis for such objection and shall be supported by legal

authority."  **Failure to comply with the provisions of Rule 72.3(a)(3)may result in the District**

**Court's refusal to consider the objection.**

So Ordered.

/s/  *Hugh B. Scott*
_____

United States Magistrate Judge

Western District of New York

Buffalo, New York
March 21, 2006